UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
CHARLES HERNANDEZ,

                Petitioner,

        -against-

D.M. UNGER, Superintendent,

             Respondent.
--------------------------------------------------------x



**MEMORANDUM & ORDER**

13 CV 4706 (RJD)

DEARIE, District Judge.

Before the Court is the application of petitioner Charles Hernandez for a writ of habeas corpus pursuant to 28 U.S.C. §2254.

A gunfight in the courtyard of a Coney Island housing project, at approximately 4:00 a.m. on September 19, 2004, resulted in the death of two young men, Allen Lewis and Yusuf McEaddy. As a result of his role in this incident, Hernandez was charged with one count each of intentional and depraved-indifference second-degree murder as to Lewis, one count of second-degree reckless manslaughter as to McEaddy, and one count each of criminal possession of a weapon in the second and third degrees ("CPW2" and "CPW3," respectively).

Hernandez's first trial in Kings County Supreme Court ended in a hung jury. He testified as his retrial and admitted that he shot Lewis but claimed he did so in self-defense. At the close of the evidence the court dismissed the reckless manslaughter charge and submitted the remaining charges to the jury, who acquitted Hernandez on both theories of the murder of Lewis while convicting him on the two weapons counts. At the time of the gunfight, Hernandez was on parole from a prior conviction for first-degree assault. Because he also had a prior conviction for CPW2, Hernandez was adjudicated a second violent felony offender and sentenced to 15 years

on CPW2 and 7 years for CPW3, to run concurrently. He was paroled in late 2018.

Hernandez's application for habeas relief advances two principal themes pled as eight separate claims. His first two claims allege that his CPW convictions "resulted in a miscarriage of justice" and that he was "deprived of a fair trial." Petition at 7. His remaining five claims challenge, on due process, fairness, and statutory grounds, the validity of his adjudication as a second violent felony offender. Id. As discussed below, none of these claims presents a basis for habeas relief.

Accordingly, the application for a writ of habeas corpus is denied and the petition is dismissed.

## BACKGROUND

### A. Trial

Trial eyewitnesses to the shootout included two women, Shaquil Butler and Sandra Vicks, whose apartments overlooked the partially lit courtyard where the violence occurred. According to Butler, Hernandez emerged from a building and opened fire first, striking Lewis, who stumbled, fired back once and tried to run, when Hernandez then fired again, between four and eight times. Hernandez then went towards Lewis's body, lying motionless on the ground; Butler watched Hernandez strike Lewis in the face with his gun and then stomp on him repeatedly.

Next, Butler noticed a second person (the other shooting victim) lying on the ground closer to the boardwalk side of the courtyard. She then saw Hernandez also take notice and run to see whether that other victim was alive. Hernandez then returned to Lewis's body, picked up Lewis's gun, and hit him with it again, saying "this is all your fault." Trial Transcript ("T.") at 331. The other witness, Vicks, testified that she saw Hernandez firing several shots toward

2

Lewis and that he looked enraged. She did not see Lewis or anyone shooting a weapon. After calling 911 and returning to her window, Vicks saw two bodies on the ground; Hernandez was next to one of them, pulling that victim's jacket while kicking him and telling him to wake up. Vicks also saw Hernandez with a gun still in his hand go toward a nearby group of onlookers and tell them to get help, and watched Hernandez leave and return to the courtyard several times.[1]

The prosecution also called victim Lewis's mother, Joyce Ealey, who testified that before the shootout Hernandez, her son, and she were among the guests at a large party that ended abruptly after a dispute arose between two other youths. She had urged her son—ultimately without success—not to go outside, where she feared the conflict would escalate. She did not witness the gunfight but when she heard the shots she immediately feared for her son.

Police responding to the report of a shooting and the involvement of a black male dressed in army camouflage fatigues saw a man matching this description (later identified at Hernandez) running from the courtyard. Seeing the police, Hernandez tossed the two weapons he was carrying over a fence into the bushes—a Glock .9-millimeter gun and an Intratec-9 handgun. Police promptly recovered both guns as they arrested Hernandez.

The ballistics evidence generally corroborated the prosecution's account. *Inter alia*, eleven cartridge cases were recovered from the scene; ten had been fired from the Glock handgun—the weapon Hernandez admits using—while the eleventh was fired from the Intratec-9—the weapon attributed to Lewis. T. 526-556.[2]

---

[1] Vicks knew Hernandez from the building. Butler, however, knew Lewis but not Hernandez, but described him as wearing an all-camouflage outfit. She later failed to identify him in a lineup. Hernandez's own testimony, however rendered any potential identification issue moot.

[2] Police also recovered five .380 caliber bullets and concluded they came from two different guns; although some 9-millimeter guns can fire .380 caliber bullets, analysis concluded that

Hernandez, in his testimony, placed himself at the same party Ealey described. He was there with McEaddy (the other eventual shooting victim), who was his friend since childhood. Hernandez testified that he was unarmed, and that as McEaddy and he left the party, they were ambushed by Lewis and his two companions, Brian and Mike. Lewis and Brian each pulled out a gun (Brian's was the Intratec-9 that was later recovered). Suspecting Mike was also about to pull out a gun, Hernandez "hit him" and "rushed him and his back went up against the gate," causing Mike to "drop" his gun, which Hernandez then retrieved as Mike fled. T. 611. (This was the Glock .9 millimeter that Hernandez later tossed as the police arrived). Lewis then began shooting at Hernandez; Hernandez first testified that he had no "independent recollection of pulling a trigger," and then admitted, "I shot back at him." (T. 610). The following ensued:

> Q: And on that date, there came a time when you came in to possession of a loaded handgun, correct?
> A: Yes.
> Q: And you then used that handgun, you pointed it and you fired it at Alan Lewis. . .?
> A: Yes.
> Q: And you pulled the trigger, you fired it more than once, right?
> A: Yes. (T. 612-13).

Hernandez then admitted the essence of much of what Vicks and Butler had said happened next: namely, that after he was done firing the weapon, he ran over to McEaddy's body, then back to Lewis's, and seeing that he was also dead, picked up the Intratec-9 handgun lying nearby and struck Lewis with it, hitting him in the face and chest several times. T. 613-14. Finally, Hernandez admitted that after leaving the courtyard, when he reached the front side of

---

those recovered in this case could not have been fired from either of the recovered 9-millimeter weapons. Additionally, the bullets recovered from Lewis's body were too deformed to determine conclusively which gun fired them, and the bullet recovered from McEaddy's body was not fired by either of the guns recovered from the scene.

the building still dressed in head-to-toe camouflage, he had that Intratec-9 in one hand and .9 millimeter Glock (which he'd taken from Mike and used to kill Lewis) in the other.[3]

## B.    Sentencing

At sentencing, the prosecution filed a statement reporting that Hernandez was convicted in 1992 in Kings County Supreme Court of CPW2 and assault in the first degree, and incarcerated from May 1992 through September 2003—facts that Hernandez confirmed upon the court's inquiry.   Sentencing Transcript ("ST.") at 3.  The court then adjudicated Hernandez a second violent felony offender pursuant to N.Y. Penal Law §70.04.

The court permitted Ealey to speak about the impact of her son's death.  She described Lewis as "innocent" and told Hernandez she hoped he would "rot in hell" and that he "deserve[d] to be behind bars in a cage."  ST. at 5.  Hernandez expressed remorse that "[t]wo people lost their lives over something senseless."  Id. at 8.  He again stated that he "didn't go looking for any trouble" and that he "did not possess a gun before th[e] incident took place."  Id. at 8-9.

The sentences required by the second violent felony offender statute were eight to fifteen years for CPW2 and five to seven years for CPW3.  N.Y. Penal Law § 70.04 (3)(b)-(c) (eff. until Sept. 2020).  The prosecution requested the maximums.

Before imposing sentence, the Court remarked that "[t]his is the classic case that illustrates what's wrong with people having guns," and that "[t]wo young men lost their lives needlessly."  ST. at 9.  The court also told Hernandez that "what [he] did was pretty egregious,

---

[3] As was fully explored at trial, Hernandez's testimony was inconsistent, in numerous ways, with portions of the many prior statements he had given in the case, including several oral statements followed by a written statement to police, and, later, testimony under a waiver of immunity before the grand jury.

having these guns and firing that number of shots in that housing project at that time." Id. at 10. The court then imposed the maximum terms but declined the state's request that they run consecutively, remarking to Hernandez, "I'm going to run those sentences concurrently because the evidence established the second gun you possessed was in the possession of someone else and you picked it up after the shooting." Id. at 11.

## C.    Appeal

Of the grounds Hernandez raised on direct appeal, relevant here is his claim that the verdicts were inconsistent in that the murder acquittal necessarily meant that his possession of the gun was innocent, which, in turn, meant (according to Hernandez's argument) that the evidence was legally insufficient to support the CPW convictions. Also relevant here is his claim that counsel was ineffective at sentencing for failing to object—again, on the basis of the murder acquittal—to Ealey's victim impact statement and to the court's reference to the death of two young men. Finally, Hernandez advanced an excessive-sentence claim. The Appellate Division, unanimously affirming Hernandez's conviction, rejected each of these claims. People v. Hernandez, 67 A.D.3d 703 (2d Dep't 2009), lv. app. denied, 13 N.Y.3d 939 (2010).[4]

The appellate court first concluded that the sufficiency and inconsistent verdict claims were unpreserved for appellate review, citing the state's contemporaneous objection requirement, NY CPL § 470.05(2), and held, "in any event," that the claims lack merit. Id. at 703-704. The appellate court held specifically that the evidence "was legally sufficient to establish [Hernandez's] guilt beyond a reasonable doubt," and that the verdict "was not against the weight

---

[4] Not relevant here, the Appellate Division also rejected Hernandez's claim that he was denied his right to remain silent.

6

of the evidence." Id. at 704. The court also held that the "verdict was not repugnant" because the "acquittal on the count of murder in the second degree did not negate any of the elements of" CPW2 or CPW3. Id. Finally, the court held that Hernandez "was not denied the effective assistance of counsel," and that "the sentence imposed was not excessive." Id.

## D. State Post-Conviction Proceedings

In October 2012, Hernandez challenged his second violent felony offender adjudication in a pro se motion to set aside his sentence pursuant to NY CPL § 440.20. Relying on certain legislative changes that he believed lowered the classification of CPW2 and CPW3, Hernandez argued that neither crime qualified as a violent felony for purposes of the sentencing enhancement. The sentencing court denied the motion by Decision and Order dated January 9, 2013 ("the 440.20 Decision"), specifically rejecting Hernandez's claim on the merits:

> The defendant contends that he should be resentenced 'because [he] was sentenced after the ameliorative amendment' to the gun possession law. In fact, however, the gun possession law has been amended to increase the severity of the crime and raise the penalties. Both crimes for which he was convicted are classified as violent felonies and, therefore, he was properly sentenced as a violent felony offender.

440.20 Decision at 1 (citing "[f]ormer PL § 265.02(2) and 265.02(4)").

By Decision and Order dated January 29, 2013 the court denied Hernandez's motion for reconsideration, stating simply that it "adheres to its decision dated January 9, 2013." Leave to appeal the 440.20 rulings was denied on June 13, 2013.[5]

## DISCUSSION

---

[5] Before moving to vacate his sentence under 440.20, Hernandez had first moved under 440.10 vacate his conviction on the grounds not relevant here.

## A.    General Habeas Standards

Habeas relief is authorized "only on the ground that [an individual] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  If rejected in the first instance by the state courts, federal review of these claims is highly deferential.  As the habeas statute provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(1), as amended by the Antiterrorism and Death Penalty Act of 1996 ("AEDPA").

This statute "erects a formidable barrier to federal habeas relief," Burt v. Titlow, 571 U.S. 12, 19 (2013), because it embodies "a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights . . . and are thus presumptively competent [ ] to adjudicate claims arising under the laws of the United States." Id. at 19. Federal habeas courts "will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy." Id. at 16 (internal quotations, citations and alterations omitted).  See also Virginia v. Le Blanc, 137 S. Ct. 1726, 1728 (2017) ("In order for a state court's decision to be an unreasonable application of this Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice") (internal quotation marks and citations omitted); but see Brumfield v. Cain, 135 S. Ct. 2269, 2277 (2015) ("As we have also observed, however, even in the context of

federal habeas, deference does not imply abandonment or abdication of judicial review, and does not by definition preclude relief") (internal quotation marks, citation and alterations omitted).

In short, the "contrary to or unreasonable application" standard codified by AEDPA "means that a state court's ruling must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Shoop v. Hill, 139 S. Ct. 504, 507 (internal quotations and citations omitted). Accord Orlando v. Nassau Cty. Dist. Attorney's Office, 915 F.3d 113, 121 (2d Cir. 2019) ("unreasonable application" standard of § 2254(d)(1) is a "bar [that] is not reached where fairminded jurists could disagree on the correctness of the state court's decision") (internal quotation and citation omitted).

## B.     Analysis of Petitioner's Claims

### 1.     Threshold Issue: Timeliness

Early activity in this proceeding reflected a concern with the timeliness of the petition. See ECF No. 4 (order dated November 7, 2013 directing petitioner to show cause why his claims should not be dismissed as time-barred); No. 5 (petitioner's responsive affirmation dated November 25, 2013); No. 6 (order dated December 23, 2013 directing respondent either to address timeliness if it contested the issue or to answer the petition); and No. 8 (respondent's submission dated January 21, 2014 contesting timeliness). Following reassignment of the case to the undersigned, the Court deferred ruling on the timeliness question and by order dated September 16, 2019 directed respondent to answer the petition.

Relevant here, AEDPA requires a state prisoner to file for federal habeas relief within one-year of the date on which his conviction becomes final, which is ordinarily the date on which direct review has concluded. 28 U.S.C. § 2244(d)(1)(A); Williams v. Artuz, 237 F.3d

147, 150 (2d Cir. 2001). The time during which any state post-conviction proceedings are pending, assuming they were timely filed, is not counted. 28 U.S.C. § 2244(d)(2). Included in this uncounted time is the period between the denial of a post-conviction motion in one court and a timely-filed application for leave to appeal it to a higher court. Evans v. Chavis, 546 U.S. 189, 190-99 (2006).

Assuming without deciding the correctness of respondent's arithmetic and its counting assumptions in Hernandez's favor, the petition was filed 134 days late. For his part, Hernandez asks that the statute of limitations be equitably tolled. He attests that during the relevant period he was twice transferred to a new facility and that there was a lengthy delay between the state court's issuance of the denial of his 440.10 motion and his actual receipt of the order.

Equitable tolling exists because AEDPA's one-year time-bar is considered a statute of limitations *only* rather than a jurisdictional bar. Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir.), cert. denied, 531 U.S. 840 (2000). Still, tolling is appropriate only in the "rare and exceptional" case where the petitioner "demonstrate[s] that he acted with reasonable diligence during the period he wishes to have tolled, but that despite his efforts, extraordinary circumstances beyond his control prevented successful filing during that time." Romero v. Ercole, 2009 WL 1181260, at *2 (E.D.N.Y. Apr. 30, 2009) (internal citation and quotation omitted); see also Holland v. Florida, 560 U.S. 631, 649 (2010). Federal habeas courts, however, have not been receptive to the grounds Hernandez invokes here—facility transfers and delayed receipt of a court's order. See generally Walker v. Sheahan, 2013 WL 2181039, at *3 (E.D.N.Y. May 20, 2013) ("Transfers between prison facilities, solitary confinement, lockdowns, restricted access to the law library and an inability to secure court documents do not qualify as extraordinary circumstances") (internal quotation and citation omitted).

In light of the totality of the circumstances, however, including the length of time the petition has been pending here, the Court finds that the fair and prudent course is to proceed to address the merits of Hernandez's claims without formally ruling on the timeliness question.

## 2. Grounds One and Two

As noted, Hernandez asserts in Ground One that his convictions "resulted in a miscarriage of justice" and in Ground Two that he was "deprived of a fair trial." Petition at 7. He offers nothing more: no legal theory, factual support, or incorporation by reference of claims raised in his state appellate or postconviction proceedings. Indeed, none of those claims (as the summary *supra* reflects) speaks in the vocabulary of trial unfairness or the miscarriage of justice, or argues those themes substantively. Accordingly, Grounds One and Two present unexhausted claims that cannot form the basis of a grant of habeas relief. See generally 28 U.S.C.§ 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that [ ] the applicant has exhausted the remedies available in the courts of the State."); Picard v. Connor, 404 U.S. 270, 275 (1971) (discussing exhaustion requirement); Daye v. Attorney Gen. of State of New York, 696 F.2d 186, 191 (2d Cir. 1982) (same).

Because claims of trial unfairness and miscarriage of justice are based on the trial record, under New York law they should have been raised on direct appeal, NY CPL §440.10(2)(c), so in the parlance of habeas jurisprudence the Ground One and Ground Two claims are deemed exhausted but procedurally barred because Hernandez can no longer return to state court to pursue them. See, e.g., Mitchell v. Griffin, 2019 WL 6173788, at *5 (E.D.N.Y. Nov. 20, 2019) (collecting authorities). A federal habeas court may review such claims only if the petitioner shows cause for the default and prejudice if it is not considered (because it has merit), or that

failure to consider the claim will result in a miscarriage of justice because he is actually innocent. Id. (collecting authorities). Hernandez has not made these showings or even addressed this aspect of his claims.

In any event, these claims would not establish a basis for habeas relief. Indeed, cries of unfair trial and the miscarriage of justice here are dubious from the outset in light of the murder acquittal and the uncontroverted testimony establishing Hernandez's possession and unlawful use of a weapon.

Doctrinally, "miscarriage of justice" in the habeas context is understood as a claim of factual innocence as distinguished from legal insufficiency. See generally Bousley v. United States, 523 U.S. 614, 623 (1998); Schlup v. Delo, 513 U.S. 298, 321 (1998). Such a claim requires, however, that a petitioner produce, *inter alia*, "new reliable evidence...that was not presented at trial," Schlup, 513 U.S. at 324, which Hernandez has not done. The fair-trial claim is similarly unsupported and hyperbolic, as Hernandez has not pointed to any feature of his trial that would rise to the level of unfairness necessary to implicate this due process guarantee. See, e.g., Estelle v. McGuire, 502 U.S. 62, 72 (1991) (fair-trial inquiry is whether alleged error "so infected the entire trial that the resulting conviction violates due process") (internal quotation and citation omitted); Dowling v. United States, 493 U.S. 342, 352 (1990) (due process/fair trial inquiry is whether alleged error is "so extremely unfair" that it "violates fundamental conceptions of justice") (internal quotation and citation omitted).

To the extent Hernandez intends through his use of the labels "unfair trial" and "miscarriage of justice" to advance the sufficiency claim he raised on direct appeal, he still fails to present a basis for habeas relief.

12

First, because the state court rejected that claim in the first instance as unpreserved, it is barred from review here by the independent and adequate state law doctrine. See generally Davila v. Davis, 137 S. Ct. 2058, 2064 (2017); Coleman v. Thompson, 501 U.S. 722, 729 (1991) A state procedural bar "is 'adequate' if it 'is firmly established and regularly followed by the state in question' in the specific circumstances presented." Murden v. Artuz, 497 F.3d 178, 191 (2d Cir. 2007) (internal quotation and citation omitted), cert. denied, 552 U.S. 1150 (2008) (quoting, Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006)). The requirement that an issue be preserved by contemporaneous objection as required by NY CPL § 470.05(2) is a firmly established and regularly followed rule for these purposes. Richardson v. Greene, 497 F. 3d 212, 217-18 (2d Cir. 2007); Petronio v. Walsh, 736 F. Supp. 2d 640, 653 (E.D.N.Y. 2010).[6]

This bar applies "even where"—as here—"the state court has also ruled in the alternative on the merits of the federal claim." Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990); see also Harris v. Reed, 489 U.S. 255, 264 n. 10, (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding") (emphasis in original). Finally, this "independent and adequate state ground" bar may be lifted only if a petitioner demonstrates "cause" for failing to comply with the state rule and "actual prejudice" if the claim is not reached, or that a lack of federal review will result in a fundamental miscarriage of justice because he is actually innocent. Harris v. Reed, 489 U.S. 255, 262 (1989); Wainwright v. Sykes,

---

[6] In the context of challenges to the legal sufficiency of the evidence, this rule requires that a defendant identify the specific evidentiary deficiency rather than, as defense counsel did here, T. at 672, merely move for dismissal on the ground that the state failed to meets its burden of proof beyond a reasonable doubt. People v. Hawkins, 11 N.Y.3d 484, 492 (2008).

433 U.S. 72, 87 (1977). As already noted, Hernandez has not even addressed this feature of his claim, so it is barred from federal review.

In any event, Hernandez's sufficiency claim is plainly without merit. Under <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Id.</u> at 319 (emphasis in original). The Appellate Division's rejection of Hernandez's sufficiency claim is not an unreasonable application of <u>Jackson,</u> or unreasonably factually, within the meaning of AEDPA.

Under the version of the NY Penal Law provision in effect at the time of Hernandez's crime (September 2004), a person was guilty of CPW2 when, "with intent to use the same unlawfully against another" he "possesse[d] a loaded firearm." NY PL § 265.03(2) (eff. until Dec. 20, 2005).[7] Hernandez of course admitted at trial that he possessed a loaded firearm and fired it at Lewis repeatedly. But he argued on appeal that his CPW2 and murder verdicts were inconsistent in that the acquittal of murder necessarily negates the unlawful intent element of CPW2. The Appellate Division did not misapply Supreme Court law—or even New York law—in concluding otherwise.

First, to the extent Hernandez's sufficiency-of-the-evidence challenge to his CPW2 conviction hinges on his inconsistent verdict claim, it fails to present a federal issue cognizable on habeas. <u>See, e.g., Roberts v. New York</u>, 2019 WL 3302381, at *9 (E.D.N.Y. July 23, 2019)

_____

[7] At the relevant time a person was guilty of CPW3 when he "possesse[d] any loaded firearm" outside his home or place of business. NY PL §265.02(4) (eff. until Dec. 20, 2005). Sufficiency as to CPW3 does not require discussion: Hernandez admitted that he possessed a loaded firearm.

("It is well established that a challenge to a jury verdict as inconsistent is not a ground for habeas relief") (collecting U.S. Supreme Court authorities). Indeed, whether on federal habeas or in other proceedings, courts simply do not undertake "individualized assessment[s] of the reason for the [claimed] inconsistency." United States v. Powell, 469 U.S. 57, 66 (1984). As the Supreme Court understood when announcing this rule, inconsistency among verdicts often reflects nothing more than "mistake, compromise or lenity" on the part of the jury. Id. at 65.

In short, Hernandez's inconsistent-verdict claim is a red herring in the Jackson sufficiency equation and, once removed, leaves a plainly meritless claim requiring little discussion. Viewing the evidence in the light most favorable to the prosecution (and, again, not considering the later-rendered murder acquittal), there was abundant evidence from which a rational juror could have inferred the requisite intent on the part of Hernandez to use a gun unlawfully: most probative is the testimony of both eyewitnesses and Hernandez which establish that Hernandez fired a loaded firearm repeatedly at Lewis in the course of a gunfight and that he was enraged while doing so.

### 3. Grounds Three through Eight: the Sentencing-Related Claims

Hernandez alleges that his "sentence would have been different if [his] attorney had performed effectively" (Ground Three); that "he was "denied his . . . Constitutional right to Due Process of Law by the Court's sentence" (Ground Four); that the state "must follow statutory law" because it "is superior to case law as a source of law" (Ground Five); that the state "intentionally and knowingly sentence[d] [him] to a wrong penal law statute that's been amended" (Ground Six); that his sentence is "unauthorized and invalid" (Ground Seven); and that he "must be afforded ...the benefit of new statutory law, due to an 'ameliorative amendment' to criminal possession of a weapon...which reduces the punishment" for these

crimes (Ground Eight).

### a. Grounds Five through Eight

Grounds Five through Eight, variations on a single theme, advance here the same sentencing challenge Hernandez raised in his 440.20 motion in state court, where it was rejected on the merits. The claim fails to present a question cognizable in this Court: as the Supreme Court has instructed habeas courts: "[w]e reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting a habeas review, a federal court is limited to deciding whether a conviction [or sentence] violated the Constitution, laws, or treaties of the United States." Estelle, 502 U.S. at 67-68.

The 440.20 court's determination that the New York crimes of CPW2 and CPW3, at the time Hernandez committed them, qualified as violent felonies for purposes of the New York second violent felony offender statute concerns purely a question of New York law. Likewise, that court's determination that the statutory amendments on which Hernandez relies were not "ameliorative" but instead increased the severity of these crimes concerns only matters of New York law. These rulings, correct or not, are simply not reviewable here. Lewis, 497 U.S. at 780 ("Federal habeas corpus relief does not lie for errors of state law"). Even if the rulings were reviewable, Hernandez would be entitled to habeas relief only if these rulings somehow reflect an unreasonable application of the holding of a Supreme Court decision, which Hernandez has not, and could not, show.

In any event, the 440.20's court's determination that Hernandez was properly adjudicated a second violent felony offender is correct. New York Penal Law § 70.04 provides that "[a] second violent felony offender is a person who stands convicted of a violent felony offense as defined in subdivision one of section 70.02 [of the Penal Law] after having previously been

subjected to a predicate violent felony conviction as defined in paragraph (b) of this subdivision." PL § 70.04(1)(a). The "criteria" for qualifying prior convictions listed in the referenced subparagraph(b) include a specific reference back to the same classificatory "subdivision one of Section 70.02". See id. at (b)(i) (to qualify as a violent felony offense, the prior conviction "must have been" for "a violent felony offense as defined in subdivision one of section 70.02."). In short, for a defendant to be designated a second violent felony offender, both his triggering (i.e., current) crime of conviction and his prior convictions must be for "violent felony offenses," and for both the current and prior convictions the definition of "violent felony offense" at "subdivision one of section 70.02" controls.

Hernandez, as noted, was convicted of CPW2 and CPW3. At the time of he committed these crimes (September 2004), subdivision one of section 70.02 classified CPW2 as a "Class C violent felony offense" and CPW3 as a "Class D violent felony offense." NY PL § 70.02(1)(b)-(c). Thus, he "stands convicted" of a violent felony offense. His two qualifying prior convictions were for CPW2—a violent felony offense—and first-degree assault, whose status as a Class B violent felony offense he does not dispute. See PL § 70.02(1)(a).

The statutory amendments on which Hernandez appears to rely in his seeking relief from his sentence did not change the classification of either of these crimes as violent felonies.[8] At the time of Hernandez's crimes, as noted, a person was guilty of CPW2 when, "with intent to use the same unlawfully against another" he "possesse[d] a loaded firearm." NY PL § 265.03(2) (eff. until Dec. 20, 2005) and a person was guilty of CPW3 when he "possesse[d] any loaded firearm"

---

[8] His state-court motion papers reference the 2005 and 2006 amendments. See L. 2005, c. 764, §3 eff. Dec. 21, 2005; L. 2006, c. 742, § 2, eff. Nov 1., 2006; and L. 2006, c. 745 §1 eff. Dec. 15, 2006.

outside his home or place of business. NY PL §265.02(4) (eff. until Dec. 20, 2005). As the 440.20 court ruled, the amendments: (i) *elevated* the severity of mere possession of a loaded firearm—CPW*3* at the time of Hernandez's crimes—by reclassifying it as a type of CPW*2*, see PL §265.03(3) (eff. Dec. 15, 2006); and (ii) *merely renumbered* possession of a loaded firearm with intent to use it unlawfully against another *within the CPW2 statute*, from subparagraph (2) to subparagraph (1)(b). See PL §265.03(1)(b). Most crucially, the amendments did not disturb the classification of CPW2 as a Class C violent felony offense under PL §70.02(1)(b).

In sum, four of the petition's six distinct sentencing challenges (Grounds Five, Six, Seven and Eight), all premised on Hernandez's misunderstanding of the amendments to New York's CPW statute, plainly fail to present a basis for habeas relief.

The remaining two sentencing challenges require little discussion.

**b. Ground Four**

Ground Four, as noted, alleges, without factual support or elaboration of a legal theory, that Hernandez was denied his "Constitutional right to Due Process of Law by the Court's sentence." Petition at 7. To the extent the alleged deprivation of due process lies in his belief that he was deprived of the "benefit of new statutory law," the foregoing statutory analysis disposes of this claim. The claim is otherwise unexhausted: on direct appeal Hernandez argued that his sentence was excessive but did not frame is as a federal due process violation.

Even making one of several available—and here, purely academic—procedural assumptions in Hernandez's favor,[9] the due-process branch of the sentencing challenge plainly

---

[9] For example, the Court could deem the due process claim exhausted but procedurally barred, which would render the claim reviewable only if Hernandez had shown cause and prejudice, which he has not. Alternatively, the Court could deem the due process theory to have been

does not present a basis for habeas relief. As noted, Hernandez received the maximum sentence authorized by New York's second violent felony offender statute. See NY PL § 70.04(3). That ends the constitutional inquiry. See Cruz v. Griffin, 2019 WL 6220806, at *19 (S.D.N.Y. Oct. 24, 2019) ("It is well settled that when a sentence is in accord with the range established by state statutory law there is no constitutional issue presented for habeas review," citing White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992)).

### c. Ground Three

Ground Three alleges that Hernandez's sentence "would have been different if [his] attorney had performed effectively." Assuming arguendo that Hernandez intends here to advance the sentencing-ineffectiveness claim he raised on his direct appeal, the claim fails to present a basis for habeas relief.

As noted, Hernandez argued on appeal that his lawyer failed to make two objections that Hernandez believes were required by his acquittal on the murder charges: namely, challenges to the victim impact statement made by Lewis's mother and to the court's explicit references to the fact that two young men died in the gunfight. The Appellate Division, as noted, rejected this claim on the merits, see Hernandez, 67 A.D.3d at 704 (Hernandez "was not denied the effective assistance of counsel").

With an ineffectiveness claim, Hernandez's burden to show an unreasonable application of Supreme Court law—here, the familiar two-prong test of Strickland v. Washington, 466 U.S.

---

sufficiently implied (and thus fairly presented for exhaustion purposes) by Hernandez's appellate excessive-sentencing claim. In that scenario, Hernandez would have to show that the Appellate Division's merits holding—that his sentence "was not excessive," Hernandez, 67 A.D.3d 704—somehow involved an unreasonable application of Supreme Court law, which he has not.

668 (1984)—is particularly high. See Harrington v. Richter, 562 U.S. 86, 105 (2011)

("[e]stablishing that a state court's application of Strickland was unreasonable under §2254(d) is

all the more difficult [because] [t]he standards created by Strickland and §2254(d) are *both*

highly deferential, and when the two apply in tandem, review is doubly so") (internal quotation

and citation omitted) (emphasis added); Cullen v. Pinholster, 563 U.S. 170, 190 (2011) ("review

of [state court]'s decision is ... *doubly deferential* [because] [w]e take a highly deferential look at

counsel's performance [under Strickland] through the deferential lens of §2254(d)") (internal

quotations and citations omitted) (emphasis added). In short, under AEDPA, "the question is *not*

whether counsel's actions were reasonable. The question is whether there is any reasonable

argument that counsel satisfied Strickland's deferential standards." Id. (emphasis added).

　　　　The answer is, plainly, yes.

　　　　As in his sufficiency arguments, Hernandez again misapprehends the legal significance of

his acquittal. First, it was not inappropriate for the court to remark upon the deaths that resulted

from the gunfight: Hernandez, in his trial testimony, admitted that he caused at least Lewis's

death by shooting at him repeatedly, and even at sentencing, Hernandez himself acknowledged

that "[t]wo people lost their lives over something senseless." ST. at 8. The sentencing court was

not relying upon a crime for which Hernandez had been acquitted when it mentioned, as

Hernandez had already commented, that Hernandez's gun possession occurred during

circumstances that left two young men dead. As for Lewis's mother, New York law grants

sentencing courts discretion to allow statements from such persons in circumstances materially

the same as those presented here. See, e.g., People v. Hemmings, 304 A.D.2d 502, 503 (1st

Dep't 2003) (defendant acquitted of murder but convicted of CPW2; court "properly exercised

its discretion" when permitting deceased victim's family to speak at sentencing), aff'd, 2 N.Y.3d

1, 5-7 (2004); People v. Rivers, 262 A.D.2d 108, 108-09 (1st Dep't) (holding that court "properly exercised its discretion in permitting family members of a police officer who died during [the] incident to speak at sentencing even though defendant was acquitted of all charges relating to the officer" but convicted of second-degree assault), lv. app. denied, 94 N.Y.2d 828 (1999). Accordingly, it was not an unreasonable application of Strickland for the Appellate Division to have concluded that counsel did not perform deficiently in failing to object to these permissible features of the sentencing proceeding.

In any event, the ineffectiveness claim would fail the prejudice half of the Strickland test. See Strickland, 466 U.S. at 688, 694 (to prevail, petitioner must show that "counsel's representation fell below an objective standard of reasonableness," *and* that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). On this record, it was not an unreasonable application of Strickland for the Appellate Division to have concluded that the court would have imposed the same sentence even if counsel had objected. First, for the reasons just discussed, either objection Hernandez faults counsel for not making likely would have been overruled. Second, apart from the court's reference to the two victims, the court's full statement to Hernandez when imposing sentence reveals the heart of its sentencing rationale:

> As far as you, Mr. Hernandez, you have this prior felony conviction for a similar charge. You did a lot of jail time on that case. You were on parole when this case happened. I really don't think you have taken full responsibility for your conduct here by what you are saying. You know, there's not too much sympathy I can show for you. You are behaving yourself in court and accepting this like a man. *But what you did was pretty egregious, having these guns and firing that number of shots in that housing project at that time.* ST. at 10 (emphasis added).

The court correctly sentenced Hernandez for what he was convicted of: "having [ ] guns" and "firing" them "in that housing project at that time." Also contributing to the severity of the

sentence, as the court remarked, were Hernandez's criminal history and perceived lack of full responsibility. And even so the court found a reason to reject the prosecution's request that the two statutory-maximum terms run consecutively: displaying a precise grasp of the trial record, the sentencing elected to run the two maximum terms concurrently "because the evidence established [that] the second gun" that Hernandez used "was in possession of someone else" first and Hernandez "picked it up after the shooting." Id. at 11.

In sum, Hernandez could not conceivably overcome the double-deference afforded the Appellate Division's rejection of his ineffectiveness claim.

## CONCLUSION

For all the reasons discussed, the application of petitioner Charles Hernandez for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied in its entirety. Because Hernandez has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

SO ORDERED.

Dated: Brooklyn, New York
      December 27, 2019

                                  s/RJD

                         RAYMOND J. DEARIE
                         United States District Judge